In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4314

LARRY JOHNSON,

*Plaintiff-Appellant,*

*v.*

KARL SAVILLE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-02187—**Amy J. St. Eve**, *Judge.*

ARGUED MAY 28, 2009—DECIDED JULY 29, 2009

Before EVANS, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Karl Saville, an officer of the
Illinois State Police ("ISP"), investigated charges that
Larry Johnson, an employee at an Illinois correctional
facility, had improper sexual relations with an inmate.
The results of Saville's investigation led an Illinois
State's Attorney to prosecute Johnson for criminal sexual
assault, but the trial judge found Johnson not guilty.
Following his acquittal, Johnson brought an action

against Saville under 42 U.S.C. § 1983, asserting a federal due process claim and a supplemental claim of malicious prosecution under Illinois law. The district court granted summary judgment in favor of Saville on both claims, and, on appeal, Johnson pursues only his malicious prosecution claim. We affirm because Saville acted with probable cause when pursuing criminal charges against Johnson, which is a complete defense to a malicious prosecution suit.

**I. Background**

From 1999 to 2004, Johnson worked as a youth supervisor at the Illinois Youth Center ("IYC") in Warrenville, Illinois, a facility maintained by the Illinois Department of Corrections ("IDOC"). In early September 2003, Barnett Gill, another IYC youth supervisor, claimed that a former IYC inmate, "A.M.," accused Johnson of improper sexual conduct. According to a report that Gill prepared for the IYC Warden, A.M. called Gill and told him that she and Johnson had sexual relations during her time at the IYC. The IDOC began an investigation and also referred the matter to the ISP, which assigned Officer Saville to the case.

On September 6, 2003, IDOC investigators interviewed A.M., who denied having sex with Johnson. However, in a subsequent interview with Saville on September 14, A.M. said that she had consensual sex with Johnson on the night of December 21, 2002. On that night, A.M. was working on a cleaning detail outside of her cell, allowing her to accompany Johnson into a supply room where

the sexual encounter allegedly occurred. A.M. also told Saville that Johnson frequently watched her strip for him from outside of her cell door. Later, at Johnson's criminal trial, A.M. explained that she initially denied having sex with Johnson because the IDOC investigators scared her and threatened to send her back to the IDOC if she was dishonest. By contrast, A.M. described Saville and other ISP officers as non-threatening and "really nice." When he interviewed A.M., Saville did not know that A.M. had previously denied having sex with Johnson to the IDOC investigators.

Besides A.M.'s statement, Saville uncovered other evidence of Johnson's guilt. Saville interviewed A.M.'s cell mate, "M.V.," who said that she saw A.M. strip for Johnson on multiple occasions. "T.M.," another former IYC inmate who occupied an adjacent cell, stated that Johnson regularly stood outside of A.M.'s cell door and talked to her. Both M.V. and T.M. confirmed that A.M. told them about the sexual encounter with Johnson, and several other current and former inmates told ISP officers that they were aware of rumors of the encounter. Still another former inmate, "C.C.," told Saville that she too had sexual relations with Johnson and stripped for him.

Saville also obtained the IYC's shift supervisor log for the night of December 21, 2002. That log indicated that A.M. was outside of her cell on a cleaning detail and that Johnson was working as a supervisor, meaning that Johnson had access to A.M. on the night in question.

On October 3, 2003, Saville interviewed Johnson, who denied having sex with A.M. Saville then prepared a

report for the DuPage County State's Attorney summarizing the results of his investigation. The report indicated that, according to the IYC's records, Johnson was the only person supervising A.M. on the night in question. The report also stated that, although Johnson denied having sex with A.M. during his interview, he confessed to watching her strip from outside of her cell door. Johnson denies making that confession.

The State's Attorney decided to prosecute Johnson, and Saville arrested Johnson for criminal sexual assault on May 24, 2004. On June 17, 2004, Saville testified before a grand jury as to the contents of his report, including Saville's claim that Johnson confessed to watching A.M. strip. The grand jury returned an indictment against Johnson and the case proceeded to a bench trial. On December 29, 2005, the trial judge found Johnson not guilty.

On April 20, 2007, Johnson brought a § 1983 action against Saville in federal court, claiming that Saville violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by giving false information to the State's Attorney and the grand jury. Johnson's complaint also set forth a claim of malicious prosecution under Illinois law. On October 17, 2008, the district court granted summary judgment in favor of Saville. The court held that Johnson's *Brady* claim failed because, with respect to the allegedly false information in Saville's report and grand jury testimony, those falsehoods were within Johnson's knowledge and therefore not "suppressed" for *Brady* purposes. The court also held that

Johnson failed to establish an essential element of his malicious prosecution claim, that Saville lacked "probable cause to arrest him."

On October 29, 2008, Johnson moved the district court to amend its findings to clarify that, in addition to his due process and state-law malicious prosecution claims, Johnson had preserved a malicious prosecution claim based on the Fourth Amendment. The court denied the motion, finding that Johnson forfeited his Fourth Amendment malicious claim by failing to develop it in his summary judgment brief.

On appeal, Johnson abandons his due process/*Brady* claim but argues that the district court erred in resolving his malicious prosecution claim on summary judgment. Johnson contends that he has a triable malicious prosecution claim under both Illinois and federal law.

## II. Analysis

We review de novo the district court's grant of summary judgment in favor of Saville, construing the evidence and all reasonable inferences in favor of Johnson, the non-moving party. *Wheeler v. Lawson*, 539 F.3d 629, 633 (7th Cir. 2008) (citation omitted). Summary judgment is proper if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* at 634.

### A.  The Probable Cause Element of a Malicious Prosecution Claim Under Illinois Law

In order to establish a claim of malicious prosecution under Illinois law, the plaintiff must show "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (quoting *Joiner v. Benton Cmty. Bank*, 411 N.E.2d 229, 232 (Ill. 1980)). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Id.* It follows that the existence of probable cause is a "complete defense" to a malicious prosecution suit. *Cervantes v. Jones*, 188 F.3d 805, 810-11 (7th Cir. 1999). Probable cause exists if the "facts and circumstances . . . would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Id.* at 811 (quotation omitted); *see also Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 266 (Ill. App. Ct. 2002) ("Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.").

Courts have often examined whether investigating officers acted with probable cause when pursuing criminal charges, making them immune from a malicious prosecution suit. A common theme in these cases is

an allegation that officers or other complainants fabricated the plaintiff's confession. In *Cervantes*, a police officer testified before the grand jury that the plaintiff had all but confessed to murder, a confession that the plaintiff denied. *Cervantes*, 188 F.3d at 808. Accepting the plaintiff's version for summary judgment purposes, we nonetheless concluded that the officer had probable cause to believe that the plaintiff was guilty of murder. *Id.* at 814. An FBI profile of the killer matched the plaintiff, the plaintiff had the opportunity to commit the crime and no corroborated alibi, and a polygraph test indicated that the plaintiff lied when denying his involvement in the murder. *Id.* at 811-13.

Though not an issue in the *Cervantes* murder case, the credibility of the victim or complainant is another common factor in the probable cause analysis. The officers in *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 571 (Ill. App. Ct. 2006), took a battery victim's statement that her boyfriend attacked her while she was pregnant, resulting in the death of her fetus. Applauding the officers for corroborating the victim's story with medical evidence and third-party statements, the court noted that the officers could have relied on the victim's statement alone, which is presumed reliable. *Id.* at 575-76. Although the victim later recanted her accusation and the officers had allegedly coerced the boyfriend's confession, the officers still had "ample probable cause" to charge the boyfriend with murder. *Id.* at 578.

Similarly, in *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001), we concluded that the plaintiff's ex-girl-

friend had probable cause to file a criminal complaint accusing the plaintiff of burglarizing her new boyfriend's house. The ex-girlfriend received items known to be stolen from the house in the mail, along with an anonymous letter that she suspected was written by the plaintiff. *Id.* at 917. Those suspicions, combined with the girlfriend's knowledge of the plaintiff's jealousy and past threats against the new boyfriend, were enough to establish probable cause as a matter of law. *Id.* at 926. The plaintiff's claim that the girlfriend falsely told the police that he confessed to breaking into the house did not preclude summary judgment. *Id.* at 924, 926.

Contrast *Fabiano*, 784 N.E.2d at 270, in which the court found a genuine issue of material fact as to whether police officers had probable cause to prosecute a day care provider for sexual abuse. Although several three- to four-year-old children made accusations against the plaintiff, those accusations were suspect because they appeared only after the officers began a 17-day investigation of the day care center and interviewed more than 100 children. *Id.* at 264, 268. Additionally, the children's statements lacked specific details, and the officers failed to corroborate each child's statement by comparing it with statements from other children. *Id.* at 268.

Comparing the evidence available to Saville in this case with that in the above cases, we conclude that Saville had probable cause to believe that Johnson was guilty of criminal sexual assault. Like the victim in *Kim*, A.M. told Saville that Johnson had sex with her, a claim

that she maintained throughout Johnson's criminal trial. This statement from "the putative victim . . . who it seems reasonable to believe" is ordinarily sufficient to establish probable cause. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (quotation omitted); *see also Kim*, 858 N.E.2d at 575 ("Where the victim of the crime supplies the police with the information forming probable cause, there is a presumption that this information is inherently reliable." (quotation omitted)). Moreover, "instead of only relying on the presumption that [A.M.'s] information was reliable," *Kim*, 858 N.E.2d at 575, Saville corroborated A.M.'s story with the statements of two other inmates that Johnson had sex with A.M. and watched her strip. Many more inmates heard rumors that Johnson and A.M. had sexual relations, while one inmate told Saville that she engaged in similar sexual conduct with Johnson. These fellow inmates' claims of the specific abuse under investigation have far more corroborative value than the children's general allegations that the court in *Fabiano* found deficient.

Like the plaintiff in *Cervantes*, Johnson also lacked an alibi. The IYC's shift supervisor log for the night in question showed that A.M. was outside of her cell on a cleaning detail and that Johnson was working as a supervisor, meaning that the two had access to each other. This opportunity to commit the crime, combined with the multiple inmate statements described above, provided Saville with more evidence of guilt than the suspicious circumstances that we found sufficient in *Logan*. Saville had probable cause to believe that Johnson had improper sexual relations with A.M.

True, some facts surrounding the criminal case reduced the reliability of A.M.'s accusation. A.M. changed her story by, first, denying having sex with Johnson during the IDOC interview and, then, admitting to the sexual encounter during her interview with Saville. But that inconsistency is immaterial because it is undisputed that Saville did not know about A.M.'s previous denial to the IDOC investigators. "The existence of probable cause is measured based on the facts known to the officers at the time of the arrest." *Kim*, 858 N.E.2d at 577. Johnson, while not disputing that Saville lacked knowledge of A.M.'s previous denial, suggests that the IDOC investigators' failure to obtain inculpatory information from A.M. means that Saville must have browbeaten that information out of her. A.M.'s testimony at Johnson's criminal trial, the only evidence in the record on this point, refutes that charge. Although A.M. was reluctant to admit to the sexual encounter to the IDOC investigators, who threatened her with reprisal, she found Saville and other ISP officers to be nice and non-threatening.

Johnson also disputes that he lacked an alibi. He claims that the IYC's shift supervisor logs showed that A.M. was "signed out" to the shift supervisor's office on the night in question. Since Gill was working in the office at that time, Johnson continues, the logs suggest that it was Gill and not Johnson who had sexual relations with A.M.

Johnson fails to distinguish among the various logs maintained at the IYC. The IYC's "cottage logs" for A.M.'s housing unit, which are distinct from the "shift supervisor

logs," listed a phone extension to the shift supervisor's office next to A.M.'s name for the 8:30-9:00 time period. According to the IYC Warden, this entry meant that any IYC employee who needed to find A.M. during that time would have to call the shift supervisor's office. Another youth supervisor coined the "signed out" language upon which Johnson seizes, testifying that the cottage logs showed that A.M. was "signed out" to the shift supervisor's office during the relevant time period.

The cottage logs are probably irrelevant to the probable cause analysis because, although Saville referenced the shift supervisor logs in his report to the State's Attorney, the record does not establish that Saville even knew about the potentially exculpatory cottage logs. *See Kim*, 858 N.E.2d at 577. Moreover, even if within Saville's knowledge, the cottage logs have little exculpatory value. At most, the logs establish that the shift supervisor was responsible for knowing A.M.'s whereabouts during a single thirty-minute window of A.M.'s cleaning detail. The logs are not inconsistent with Saville's report that, on the night of the alleged sexual encounter, A.M. was outside of her cell on a cleaning detail and Johnson was working as a supervisor. So even taking the cottage logs into account, Saville had substantial evidence of Johnson's guilt.

With respect to Johnson's dispute that he never confessed to watching A.M. strip as Saville claimed, we accept Johnson's version for summary judgment purposes. As the above cases make clear, however, the fact that the plaintiff disputes his confession does not

preclude summary judgment if the remaining, undisputed facts establish probable cause as a matter of law. *Logan*, 246 F.3d at 926; *Cervantes*, 188 F.3d at 811. We conclude that the undisputed facts in this case "would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion" that Johnson was guilty of criminal sexual assault. *Fabiano*, 784 N.E.2d at 266.

Finally, Johnson argues that the district court misapplied Illinois law by examining whether Saville had "probable cause to arrest," as opposed to "probable cause to initiate a criminal prosecution." According to Johnson, the critical element of his malicious prosecution claim is the absence of probable cause to prosecute, not the absence of probable cause to arrest. The former is easier to prove, Johnson continues, because an officer who makes a split-second arrest may justifiably rely on less reliable evidence than a prosecutor who initiates a criminal prosecution.

Johnson's argument touches on the commonsense observation that the type of evidence that will support a finding of probable cause depends on the nature of the crime and the officer's role in the criminal proceedings. Courts assess probable cause based on "the totality of the circumstances," *Cervantes*, 188 F.3d at 813, and those circumstances include the extent of the officer's involvement in the criminal case and, relatedly, the amount of evidence available to the officer. So if an officer makes a split-second, warrantless arrest of a riotous protester, the court might simply ask whether the surrounding circum-

stances gave the officer "probable cause to arrest." *Penn v. Harris*, 296 F.3d 573, 577 (7th Cir. 2002). If, as here, an officer conducts an extended investigation, interviews the suspect, and allegedly lies to the grand jury in order to obtain an indictment—while incidentally arresting the suspect along the way—the court might frame the inquiry as whether all of the available evidence provided "probable cause for the prosecution." *Cervantes*, 188 F.3d at 810.

However, Johnson goes too far in suggesting that the district court erred by referring to Saville's probable cause "to arrest" rather than probable cause "to prosecute." Whether the officer simply makes an arrest or conducts an extended investigation, the basic underlying inquiry is the same: does all of the evidence available to the officer support an objectively reasonable belief that the suspect was guilty of the crime? *Compare Penn*, 296 F.3d at 576-77 ("Probable cause exists when, based on the facts known, a reasonable person would believe a person was guilty of committing an offense."), *with Cervante*s, 188 F.3d at 811 ("Probable cause means the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." (quotation omitted)). We, like the district court, have examined that evidence and conclude that Saville acted with probable cause when investigating the charges against Johnson, preparing his report for the State's Attorney, and testifying before the grand jury. That gives Saville a complete defense to Johnson's Illinois malicious prosecution claim.

### B. Federal Malicious Prosecution Claim

In addition to his state-law claim, Johnson asserts a federal malicious prosecution claim grounded in the Fourth Amendment. More specifically, Johnson invites us to revisit *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), which he characterizes as foreclosing his Fourth Amendment malicious prosecution claim. We can think of several reasons to decline Johnson's invitation.

First, we agree with the district court that Johnson forfeited his Fourth Amendment malicious prosecution claim by failing to develop it in his summary judgment brief. Johnson asks that we overlook forfeiture because his theory of malicious prosecution was barred by *Newsome*, so attempting to argue that theory to the district court would have been futile. *See Ienco v. City of Chicago*, 286 F.3d 994, 999 (7th Cir. 2002) (declining to penalize a plaintiff "for failing to convincingly argue . . . a cause of action at summary judgment" that was fore-closed by prior circuit precedent). What Johnson fails to acknowledge is that this exception to forfeiture applies only when an "intervening change in the law" removes the precedential bar. *Id.* Unlike the situation described in *Ienco*, no intervening decision by this court has under-mined *Newsome*; it is Johnson who, for the first time on appeal, attacks *Newsome* and proposes a novel reading of the Fourth Amendment. As Saville points out, the novelty of Johnson's Fourth Amendment claim makes the case for forfeiture even more compelling. *See Kunz v. DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008) ("Especially on a question that would require the application of a

novel legal theory to a new set of facts . . . the district court must have the first opportunity to rule with the benefit of full briefing and consideration.").

Johnson suggests that the Supreme Court's decision in *Wallace v. Kato*, 549 U.S. 384 (2007), is an intervening change in the law that undermines *Newsome*'s rationale. All that the Court said in *Wallace* was that it has "never explored the contours of a Fourth Amendment malicious-prosecution suit under § 1983 . . . and . . . do[es] not do so here." *Id.* at 390 n.2. This footnote statement on what the Court hasn't decided does not require us to reexamine circuit precedent. Moreover, *Wallace* was not "intervening" with respect to Johnson's lawsuit. *Wallace* came down on February 21, 2007; Johnson filed his complaint in the district court on April 20, 2007; Johnson did not file his brief in opposition to summary judgment until September 9, 2008. If Johnson thought that *Wallace* gave a new, federal flavor to his malicious prosecution claim, it required no clairvoyance to include that argument in his summary judgment brief to the district court.

Second, Johnson over-reads *Newsome* as foreclosing his federal claim. We held in that case that the "due process clause" does not support a constitutional tort of malicious prosecution if state law provides a parallel remedy. *Newsome*, 256 F.3d at 751. *Newsome* left open the possibility of a Fourth Amendment claim against officers who misrepresent evidence to prosecutors, provided that the statute of limitations for such a claim has not expired. *See id.* at 749-50. Circuit precedent did not necessarily prevent Johnson from bringing a Fourth Amend-

ment claim based on Saville's allegedly false report to the State's Attorney and grand jury testimony. *See McCullah v. Gadert*, 344 F.3d 655, 659 (7th Cir. 2003) (recognizing a Fourth Amendment wrongful arrest claim against an officer who allegedly gave false information in an incident report and at a preliminary hearing).

Finally, even if we reached the merits of Johnson's Fourth Amendment malicious prosecution claim, we do not see how Johnson would prevail. Although Johnson's brief does not delineate the elements of the federal malicious prosecution claim that he asks us to recognize, it is likely that one such element would be the absence of probable cause to initiate criminal proceedings. *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (Although the contours of a Fourth Amendment malicious prosecution claim "remain uncertain . . . such a claim fails when there was probable cause to prosecute . . . ."). Given our holding that Johnson's state-law malicious prosecution claim fails because Saville acted with probable cause, his federal claim would fail for the same reason.

### III. Conclusion

Johnson's malicious prosecution claim fails because he has not shown a genuine issue of material fact as to whether Saville acted with probable cause when pursuing criminal charges against him. We AFFIRM the district court's grant of summary judgment in favor of Saville.